All right, Ms. Dalby, whenever you're ready. Good morning, Your Honors. Good morning. My name is Nancy Dalby. I represent the appellant in this matter, Amanda Underwood. The issues, there's two issues basically presented by the appeal from the district court in this case, and one is should Ms. Underwood be precluded from bringing her 1983 claim. Could you please? I'm sorry. Is that better? Yes. Thank you. Okay. Should Ms. Underwood be precluded from bringing her 1983 claim in federal court for violation of her due process rights based on a summary decision by the West Virginia Supreme Court in the appeal of the termination of her parental rights based on a violation of due process? And whether or not the West Virginia statutory scheme used in abuse and neglect cases is constitutional, and if so, was it applied to Ms. Underwood in a constitutional manner? The West Virginia Supreme Court found that, dealing first with the preclusion issue, West that Ms. Underwood had received all the due process that was required by the statute. This was in a summary proceeding called a memorandum decision. Under the West Virginia rules for appellate courts, that means a summary proceeding. It's not an opinion. No oral argument was allowed, even though asked for. And it was based simply off of briefs. And it specifically indicated in the memorandum decision that it did not see any significant issues of law that it was addressing. This was the basis, however, for the preclusion in district court saying that Ms. Underwood has had a full and fair hearing that allowed her, allowed the court to preclude her from bringing the due process claim in the district court. This court has held in Weller that violations of state law do not provide a basis for due process claim in federal court. It seems axiomatic that providing what process, arguably providing what access was provided in a statute, a state statute, should not then be a basis for saying that due process, federal due process has been provided. Precluding the appellant from going to federal court to say that the due process, whatever it was, that the state provided was not federally sufficient, constitutionally sufficient. There must be a determination that the process provided was appropriate to the interest at stake and was provided at a meaningful time and in a meaningful manner. This was not dealt with by the West Virginia Supreme Court. And there's a long line of cases defining what constitutes due process from Mullane versus Central Hanover Bank and Trust in the 1950s saying that the process provided has to be appropriate to the state at interest. And Armstrong versus Manzo in 1965 in the U.S. Supreme Court saying that the process has to be provided at a meaningful time and in a meaningful manner. Specifically, what are you arguing should have been done here that was not? In terms of? To satisfy the due process that you are describing at a more general level. And I'm just asking for specificity. Ms. Underwood was in control of her children. She had full custody of her children at a time when the West Virginia Department of Health and Human Resources took custody of her children without any pre-taking deprivation, pre-deprivation hearing, notice or hearing, or any post-deprivation notice or hearing. There had been a prior taking under a court order, which my position is never gave the court jurisdiction. It was not in accordance with the statute. It was not in accordance with due process. It was not a duly signed order. It did not comport with law. However, under that announced from the bench order, because there was no written order at the time the first taking of the children happened, the department then bootstrapped onto that a second taking of the children for which there was absolutely no prior notice, even though she was represented by counsel, even though she was available, knew where she was. Nobody told her that there was going to be a taking of her children. And nobody contacted her counsel. She was spoken to directly. She was threatened with kidnapping and required to bring her children to the department where the children were again, for the second time, snatched from her arms, screaming and crying. What prohibited you from raising these arguments before the Supreme Court of Appeals in West Virginia? I did not know at the time that I was at the Supreme Court of Appeals about the first, how the order came about in the beginning to originally, that the order that the court Had I known that, I would have been able to file a writ of prohibition. I would have been able to raise the issues of whether or not there was, the judge exceeded his authority. What prohibited you from knowing that? I wasn't, when the first order was issued, neither myself nor, and neither Amanda Underwood was not a party to the case. She wasn't present at the hearing. The department knew. Wouldn't a review of the court records have shown you that? A review of the transcript of the hearing, which was provided to me in November in the district court after these cases had been briefed, basically, the first time on summary judgment. Right, so you alleged that the transcript is what prohibited, that the unavailability of the transcript is what prohibited you from raising these issues. Even the lack of knowledge that this hearing had existed. There had been a prior, a transcript of part of the hearing, which had been in the morning. Wasn't your client there? No, no, that's the problem that I've got with it. She was not there. She wasn't even a party to the case. She was not at that hearing. The department knew where she was. They had just been to her house. They knew how to contact her, and yet they didn't even bother to contact her and say, we're going to ask the judge to take custody of your children from you. Please appear at this hearing and present your side. And at the same time, the judge entered or announced from the bench that he was removing these children, not only from the father, who he did have in court in front of him, but from the mother. Were you aware that a hearing had been held that involved the taking of the children? No. You were not aware of that? No. I had no way of knowing that. I was not a part of that case. I was not even present at that time. I was at a funeral for my mother when I was appointed to represent them at that hearing. The judge knew that I was not available. Not that you knew it when it happened, but you never learned it later until you got the transcript? Until I was given this transcript. The only transcript I had did not have the part where the second part of the hearing was held later in the day. I had no way of knowing that. I was not a privy to that case because these cases are confidential. I represented nobody at that time. I was not told. The judge did not inform me or my client that he had held a hearing ex parte without her, at which he had decided to deprive her of the right to her children, not even knowing her name, knowing nothing about her, or having no allegations against her to say that there was any imminent danger to these children as to her. Well, when counsel was appointed, a preliminary hearing was scheduled. Yes. And your challenge to that is what exactly? To the preliminary hearing that was held? Yes. There was no notice so that she could appear at the time that the judge decided to enter an order depriving her of the custody of her children. She did not see her children, an 8-month-old baby and a 2-year-old child, for 10 days. They were taken from her arms in the night by Ms. Carper and an armed police officer with no order. She had no idea what was going on. Are you referring to the preliminary hearing scheduled in July? Yes. After which the court returned the custody to the plaintiff conditioned on compliance with the safety plan? It was not conditioned on compliance with the safety plan. There was nothing. If you read that transcript, simply ask of her, would she enter into a safety plan? I answered for her, she would be willing to do the drug test and not have Mr. Okay, well, in compliance with those requirements, whatever you may call it. What was infirm about that process? There was no preliminary hearing as to Ms. Underwood. She came into the courtroom. The prosecutor said to the judge, we are returning the children to Ms. Underwood. That was the only thing. I'm trying to understand a couple of things. You said that there was no pre-taking or post-taking hearing. That was the second taking. The first taking, there was no pre-taking notice in hearing. There was a preliminary hearing at which there was nothing pursued against Ms. Underwood. The department simply said, we're giving the children back to her. I do understand that, but you also said, I thought that there was no post-taking. There was no post-taking hearing. At the second taking on July 27th, when they took them on July the 10th, pursuant to the announced order of the court, which had not been signed or entered. Well, she was instructed to bring the children in July because she took drug tests that were returned as dilute, which suggested tampering. Is that not correct? That may have been the department's rationale, but because we never had a hearing, that was never tested. There was no test to determine whether or not she took a drug test that was dilute or what the meaning of a dilute drug test was, whether it meant anything, other than that she drank too much water before she took the test. It was never introduced into evidence under the rules of the evidence because we never had a hearing. Let me go back. I know we're jumping around with you. It may be hard to follow, but on the July 10th hearing, was the husband there? The husband was there. The husband was there, but the wife's not there. Because there was an ongoing case involving the husband and an ex-girlfriend of his who had a child by him, and that was the subject of the case at the time. Ms. Underwood was not a party, nor were Mr. Underwood's two children by Ms. Underwood. The Supreme Court of Appeals of West Virginia upheld the termination, and they were not aware of the untimely initial petition? No, they were not. They were aware. I had stated as part of my petition that there was no petition filed at the time an order was entered in accordance with law. I did not have any idea that what the judge had entered into and what the prosecutor had told him he could do was ratify an emergency taking. But you did present, as I understood it, the fact that you just set out to the West Virginia Supreme Court of Appeals the removal of the children from custody and the later permanent termination of rights. Yes, I set out that the children had been removed from an order entered stating that it was based on a petition that had at that point not been filed and was not filed for three more days. However, the order itself was styled temporary custody. There are two distinctions in the West Virginia Code. There's emergency custody and temporary custody. When I got the transcript, what was revealed is that this was actually done under an emergency. As an emergency, that's what the prosecutor asked for, and she set out the procedure that would have to happen, which is the filing of a petition within two days. That didn't happen. The petition was not filed in two days like it was required to be by the statute. The statute's saying that any taking without filing that petition was void and the children had to be returned. They did not do that. They did not inform the court when they came in on the 20th under this temporary or order of temporary custody, not emergency custody, that they had not met the statutory requirements for jurisdiction and custody and that they no longer had custody of these children. It's important. It's important because on July 27th, the Supreme Court found that my client entered into a deal, even though there's not one word said by my client in that whole transcript, but that she entered into a deal and she waived very valuable due process rights to have a hearing and have a determination that the children had been in imminent danger with her and that their best interest was served by staying with the state. That never happened. That's what's required, but that never happened. But the Supreme Court found that that didn't matter, that they did not follow the statute, that my client had not affirmatively waived anything, that simply the children were returned. And she agreed to cooperate with an investigation. And one of the things that she would do is have Mr. Harrell not live in the home. She would take drug tests. She would call in every day and she would go for drug tests when it was told for her to do that. As the record shows, they gave her no protocol for the call-ins. They did not say, when you call in, you must leave a message so we know you called in. She called in every day, but they didn't tell her she had to leave a message. So Ms. Carper, on the 27th, decided she had not called in because she had not left a message. She threatened my client with, she didn't call me. She didn't say there's a problem, anything. We want to talk to your client. We want to take the children. We think they're in danger. Nothing. She didn't ask the prosecutor to set down a hearing or obtain a court order. She simply called my client and said, come in and bring the children or we will have you arrested for kidnapping. Okay. You've run out of time, but you've got some time remaining. Let's hear from Ms. Schaffer. May it please the court, my name is Natalie Schaffer, and on behalf of the appellees, I respectfully ask this court to affirm the district court's order granting summary judgment on all claims. The appellant has asked this court to reverse summary judgment as to two claims. First, the constitutionality of Chapter 49 and the companion rules and regulations associated with the West Virginia Child Welfare Act, both facially and as applied to the appellant. And secondly, to reverse summary judgment with respect to the appellant's claim under Section 1983 for a 14th Amendment due process challenge based solely on the removal on July 27, 2009. Before I jump into the analysis with respect to the two main legal issues involved in this appeal, I do want to address what was discussed by the appellant. First, with respect to the initial taking on July 10th, that initial taking was in specific response to a bench oral order directing CPS, Child Protective Services, to remove the two children from the home of Ms. Underwood and her husband. The reason for that, and this transcript was available, but the reason for that was because the hearing reconvened after Mr. Harrell, the husband, tested positive that day for a cocktail of drugs. And the court found imminent danger and removed all of the children in the home. In response to the state amending its petition to include the plaintiff and her two children? Correct. So it wasn't suspended. There was an oral request. There was an oral request made simply as a result of the reconvened drug test that was returned positive because the children were in the home of Mr. Harrell, who lived with the appellant, Ms. Underwood, and these children. So the court, it was a Friday, the court from the bench issued an oral order for CPS to remove the children immediately based on the imminent danger associated with Mr. Harrell's drug use. The following Monday, on the 13th, the court signed an order of temporary custody, assigning the DHHR custody of all of the children, including the appellant's two children, finding imminent danger. Ms. Dalby, counsel for Ms. Underwood, the appellant, was appointed that Friday, July 10th, by the court in that hearing. Granted, Ms. Dalby and Ms. Underwood were not present at that time, but Ms. Underwood's husband was, and so was his attorney. And Ms. Dalby was advised the following day, Saturday, July 11th, by the guardian ad litem via email that is attached in the record, that she had been appointed in this case to represent Ms. Underwood with respect to the adjudication and that there was a preliminary hearing set for July 20th in accordance with West Virginia law that requires a preliminary hearing within 10 days of a taking. Did Ms. Dalby and Ms. Underwood have any prior relationship? I'm unaware. There's nothing in the record to suggest that. Thank you. Now, I'm going to be confused, and I'll readily admit that, about the facts in this case. But I understood Ms. Dalby to say she was never aware of what had transpired on 7-10 with regard to the removal of the two children. What had happened? Go ahead. What had happened, the transcript was available. Ms. Dalby had a copy of the transcript. The transcript had been available during the pendency of the underlying abuse and neglect case. What happened was that original transcript did not indicate or reflect the reconvened portion where the court ordered from the bench to remove the children. So, November of last year, years later, my firm and myself, defending this civil action, looking back at the record, it's clear that there is some portion of that that has to have been missing. I took it upon myself, as a matter of due diligence in defending this matter, representing my clients, to contact the court reporter. He went back through, found his tapes, and sure enough, located a reconvened, very short reconvened, portion of that hearing where the court did, in fact, order removal. And you discovered that by examining the docket? Oh, absolutely, absolutely. Well, and also, because of the fact that there was an order entered the 13th, and the order from the 13th acknowledged the hearing from the 10th. Well, more than the hearing. And the removal, of course, yes. And the removal was. Correct. The removal had occurred. The children, Friday, were taken out of the, in effect, out of the home. Correct. So, I mean, she knows that night her children are not in her house. Correct. Correct, Your Honor. Notice. And Ms. Dalby knows she's been appointed the next day. Correct. Via email from the guardian ad litem. Now, notably, I would like to point out that Ms. Underwood, in an affidavit in the underlying case, and in this case, specifically noted that prior to the taking on the 10th, Ms. Carper, the CPS worker, did extend the courtesy of contacting her to advise her that the court had so ordered. And so there was somewhat prior notice, but, again, it was a court order issued for the bench. CPS had to follow it and remove the children that Friday based on imminent danger. Since that time, to the extent that there was an issue that was unresolved, all of those issues were raised on appeal to the Supreme Court of West Virginia. First, the appellant is collaterally stopped from bringing all of these claims arising from purported due process violations. And the basis for that is all of those issues, both factually and legally, were raised in front of the Supreme Court of Appeals of West Virginia. May I interrupt you for just a moment? Yes, sir. I just want to make sure I understand. Assuming hypothetically, purely hypothetically, that we were to agree with the appellant here, what relief really is – what is your understanding of what the appellant is seeking here? It's unclear. However, it appears to me from reviewing the briefs, my only interpretation is that the appellant is seeking a complete – Do-over? A complete finding of the unconstitutionality of Chapter 49. Now, at that point, I don't know what the relief would be because the children have been adopted and there are – Children have been adopted? Absolutely, Your Honor. Yes. We have – this proceeding, the abuse and neglect proceeding – I just wonder, is there no damages claim being appealed here? The district court didn't even get to the issue of damages because the court found, just as a preliminary matter, that these matters were collaterally stopped because the appellant appealed to the Supreme Court of Appeals of West Virginia in the state court. Right, I understand that. I'll ask Ms. Dalby. She was reacting as I asked you, but surely nobody thinks a federal court is going to undo an adoption. Surely nobody thinks that. Well, and that's a component of the issue here. And the issue really is the applicability of preclusion to the Supreme Court of Appeals of West Virginia. Ms. Underwood did not appeal – Well, I'm just wondering if it's more mootness than preclusion. What are we fighting about here? We're not fighting about the abstract constitutionality of this statute. That can't be what this case is about at this stage, certainly. At this stage, based on the appellant's brief, the issue appears to be that the statute is unconstitutional because it does not require clear and convincing evidence at the time of termination. This issue is the only issue that is raised as a facial challenge to the statute. And in regard to that, our response is, first, that issue should be precluded because the Supreme Court addressed all of the issues and found no due process violations in this specific case. But as it relates to the substance of a facial challenge with respect to a clear and convincing evidence standard at the point of termination – But could we actually be precluded, assuming we had jurisdiction, by a state court determination of the constitutionality under the federal statute? Could a federal court ever be precluded by that? The – I mean, that would gut all of Article III, wouldn't it? Or a good part of it. Well, I don't – I don't think – I think that the finding of the Supreme Court of Appeals that no due process violation as it relates to Ms. Underwood – Okay, as applied. As applied. Okay. Now, to the extent that a facial challenge could have been raised in the underlying case, according to West Virginia preclusion law, if an issue could have been raised and simply was not, that likewise is precluded. So it's certainly not a matter of the court not having jurisdiction to address the federal constitutionality of a statute. That jurisdiction is without question. But the issue here is simply whether or not the statute requires clear and convincing proof at the time of termination. And in this case, first, the basis for that, the legal authority for that, is Santosky. It's a United States Supreme Court decision, and notably, Santosky in its own footnote, footnote three, acknowledges the state of West Virginia's child welfare law does require proof by clearing convincing evidence. Santosky specifically itemized all of the states that do comply and specifically listed West Virginia as one of those states that is constitutionally compliant with the requirement of the standard of proof. And, of course, the reason behind that is, and we do not dispute, natural parents have a fundamental liberty right and interest in their children. And that is not disputed. In fact, there's very little in terms of the legal issues and, frankly, the factual issues that are in dispute. What is in dispute, however, is whether or not the, one, the plaintiff or the Ms. Underwood, the appellant, should be precluded with respect to the as-applied challenges and the 1983 matters based on the decisions by the Supreme Court of Appeals of West Virginia. And, two, with respect to a facial challenge to the statute. And the only basis for that facial challenge is the standard of proof. With respect to that facial challenge, two things. One, it should have, it could have, but was not raised in the state court and, therefore, has been waived and or should be precluded under West Virginia preclusion law. But, two, even getting to the substance of the facial challenge, it fails to satisfy what would be required to show a facial challenge. At three, it's moot. Well, I guess, frankly, I think that, I don't know if, although there is. Suppose that Ms. Underwood has other children who could possibly, I just don't understand how there could be a cognizable facial challenge under the circumstances of this case to a statute, to a state statute. Well, we don't either because, yes. Could I ask about the damages from the, would that survive the adoption, et cetera? Because there was a request for damages under the 19, I think under the 1983 claim. I think if the 1983 claim, based on a 14th Amendment due process violation, survived. Based on, and the only factual basis, an alleged factual basis for that is the July 27th removal due to the, arising from the violation of the safety plan. That's the removal that is the sole basis for the 1983 claim in this appeal. But assuming that that claim survived, I do think that it is possible that the appellate still could maintain an action for damages. Because it is a tort claim independent of the ultimate termination of her parental rights. In other words, I think that it is certainly feasible that a parent could have a 1983 claim for a due process violation. And during the pendency of, for example in this case, an abuse and neglect proceeding. But nevertheless, subsequent to that, still fails in the various terms of the proceeding. Loses her parental rights. But it still may be able to proceed on a 1983 due process violation based on some other unrelated but due process violation. I do think that they are independent. But I think in this case, the 1983 claim nevertheless fails because of preclusion and because there was no due process violation. I would point out that to the extent that it was argued earlier that Miss Underwood, the appellant, was not aware of the emergency taking. Obviously she was aware as Chief Judge Traxler pointed out. She was there when the children were removed on the 10th. But in so far as the argument that her counsel was unaware. I would simply point out that in the petition for appeal to the Supreme Court of Appeals. It was specifically noted that this was an action arising from an emergency taking. I would also point out, and this is in the appendix, page 443. During a hearing in August. During the dispositional hearing to determine whether the rights would be terminated. Miss Daube specifically stated to the court and acknowledged that this was an emergency taking. So this is not a situation where there's new information that would permit a collateral attack in federal court. When we have a specific finding by the Supreme Court of Appeals of West Virginia. Where all of the issues that have been briefed to this court and to the district court below. Have been raised and dispensed with by West Virginia's highest court. I would also point out that in so far as the. The claim that the Supreme Court should not be given preclusive effect because it was unaware of the timing of events. One, I think that the timing is wholly irrelevant to an issue, a matter of due process. But secondly, more importantly, the Supreme Court was well aware of the timing of events. Again, in the petition, and this was noted by the court in the memorandum decision. The purported, the transcript in this, the purported significance of the transcript. Was specifically rejected by Judge Goodwin into the district court. The reason for that is when you review the petition and the writ of habeas corpus. Both filed in state court and both denied the writ was refused and the appeal was denied. The appellate specifically acknowledged the timeline of events. She acknowledged that the children were removed on the 10th because of an imminent danger finding in court. A hearing that she was not present at. She also in her petition for appeal to the state Supreme Court and the writ of habeas corpus. Acknowledged that there was the order entered of temporary custody investing the DHHR with that custody. And it was signed that Monday, the 13th. By this time, Miss Dalby, Miss Underwood's attorney was provided with that order. Because the order specifically reflects and the docket sheet of the clerk reflects that that order was sent to Miss Dalby via fax. Two days later, for reasons unknown, but the record does not reflect the reason why. But nevertheless, two days later, DHHR solidifies the reasoning for the removal in an amended petition. And the amended petition sets forth concerns about Mr. Harrell's drug use. That was obvious from the July 10th removal and potential drug use by Miss Underwood. That was filed on the 15th. Correct. That was filed on the 15th and also provided to Miss Dalby as counsel for Miss Underwood. And since that time, in the underlying abuse and neglect case, there was a preliminary hearing timely held. During which, Miss Underwood agreed to a safety plan. She violated the safety plan within a matter of a week. The DHHR had the children returned pursuant to the order of temporary custody. After adjudication, Miss Underwood and Miss Dalby attended 13 different hearings in this proceeding alone. And never raised any objection regarding the custody, regarding perceived due process violations. And instead actually affirmatively denied having any objections to the proceeding. And in fact, specifically affirmed the way, the manner in which custody has been held. For instance, the improvement period terms that counsel and the appellate agreed to included a visitation schedule. Clearly they don't have, she doesn't have custody if there's a visitation schedule. And she also agreed to, and in fact I would also add that there was an order entered in June of 2010. Before disposition that indicated that custody was still vested with the DHHR. Therefore, if there are no questions from the court. I would simply request that the court affirm the district court's judgment of summary judgment in favor of the appellees. Thank you. Thank you, Ms. Bick. Ms. Dalby, reply. I'd like to respond to the allegations on the issues that were raised on examination with Ms. Schaffer. Could you, before you do that, just very briefly, what specifically are you seeking? Well, I guess, what are you appealing and what are you seeking from this court? In this court I'm appealing the district court's refute of the summary judgment of my client's 1983 damages action. Damages claim. Now I've made no claim for return of the children. That is not allowed under Rooker-Feldman and many other things that would not be appropriate to bring to federal court. So you're working solely on claims for damages against certain individuals in their individual capacity. Yes. And that's it? Yes. But that plus the allegation that the West Virginia statute and the statutory scheme is unconstitutional. But don't you agree with me that that's irrelevant to your claim for damages? Whether the statute is constitutional or not on its face is irrelevant to whether any one of the individual defendants at Belize deprived your client of due process or some other constitutional entitlement. It's a separate claim from the due process claim. It is not a claim for damages based on the unconstitutionality. But why would we decide it?  What authority do we have as an Article III judge in this case at this posture to decide the abstract question of the facial constitutionality of a West Virginia statute? My client was injured by that statute. Right. And if you obtain a reversal and it goes forward in the district court, she may be entitled to damages. Perhaps not. But you just said you're not challenging the adoption. So I'm sorry. I just don't understand your theory for why we would decide the abstract question of the constitutionality of a state statute that has no bearing on your client's entitlement to damages. It's not an abstract question because my client of childbearing age living in West Virginia and having another child is subject to being subjected to that statute. That would be true of anybody living in West Virginia with children. The situation can potentially recur. The question is there would have to be some similar process before that could happen, which is a big if. No, there was already another case with my client and her daughter because she was involuntarily terminated to her first two children. When she had her second child, they automatically filed a petition against her under this same statute. In which you can challenge the statute? We're not with the West Virginia Supreme Court. They not only don't uphold the due process that's in the statute, they waive any due process that's in there. They have a history of that. You can read all of their decisions. They're all online. And you can see that they have never upheld any due process. They waive all the due process in the thing. It's very important to the people of West Virginia. It's very important to my client for her to be able to continue to live in West Virginia to not be subjected not only to an unconstitutional statute, but a statute that's made more unconstitutional by the failure of the West Virginia Supreme Court to narrowly construe it so that it meets not only meets the constitutional test, but that protects people in West Virginia, including my client, from being not being given due process. You're not asking us to overrule the West Virginia Supreme Court, are you? I'm asking you to look at the statute and say the statute does not contain sufficient, narrow, it's not narrowly tailored to serve the compelling state interest. It is not, does not provide established due process rights such as pre-taking notice and pre-deprivation notice and hearing or sufficient post-taking notice and hearing. It does not provide that. Everybody, including my client, is at risk in West Virginia because of that statute. Everybody who has children, everybody grandparent who has custody of children, it includes almost everybody in West Virginia that's at risk because of the statute. And the failure of the Supreme Court to narrowly interpret it so that it, so that the fact that it is unconstitutional doesn't harm the people of West Virginia. And why isn't, your time is up, but if you don't mind, why isn't the proper avenue to relief in cases such as this a petition for cert to the Supreme Court of the United States, which could then review the action of the Supreme Judicial Court of Appeals of West Virginia? For numerous reasons, my client did not choose a petition for cert to the United States Supreme Court. And those are her reasons. It could be. It could be. Okay. Thank you. All right, thank you. We'll come down and greet counsel and then go into our last case.
judges: William B. Traxler, Jr., Allyson K. Duncan, Andre M. Davis